UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

ALTON P. WALDEN,

                      Plaintiff,                    **MEMORANDUM AND ORDER**
                                                             CV-11-2721 (DRH)

      - against -

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                      Defendant.

-------------------------------------------------------X

**APPEARANCES:**

**For the Plaintiff**:
Kassoff, Robert & Lerner, LLP
100 Merrick Road, Suite 508W
Rockville Centre, NY 11570
By:    Steven P. Lerner, Esq.

**For the Defendant**:
United States Attorneys Office
Eastern District of New York
610 Federal Plaza, 5th Floor
Central Islip, NY 11722-4454
By:    Vincent Lipari, Esq.

**HURLEY, Senior District Judge**:

       Plaintiff Alton P. Walden commenced this action pursuant to 42 U.S.C. § 405(g) seeking

judicial review of a final decision by the Commissioner of Social Security ("Commissioner" or

"defendant"), which denied his claim for disability benefits.  Presently before the Court is the

defendant's motion for judgment on the pleadings affirming the Commissioner's decision to

deny plaintiff Social Security disability benefits.  For the reasons set forth below, defendant's

motion for judgment on the pleadings is granted and the decision of the Commissioner is affirmed.

## BACKGROUND

### I.   *Procedural Background*

Plaintiff applied for Social Security disability insurance benefits under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "SSA") on September 2, 2008.  (Transcript ("Tr.") 10, 92-95.)  Plaintiff alleged that since January 1, 2006, he has been disabled due to depression, heart disease, and high blood pressure.  (Tr. 28-29.)  Plaintiff's application for disability was denied on February 9, 2009, (Tr. 60-65), and plaintiff subsequently requested a hearing before an administrative law judge ("ALJ") on February 20, 2009.  (Tr. 66.)  A hearing was held before ALJ Brian J. Crawley on June 29, 2009, where plaintiff, although informed of his right to representation, appeared unrepresented.  (Tr. 17-57.)  The ALJ issued a decision on November 2, 2009, finding that plaintiff was not disabled within the meaning of the SSA.  (Tr. 10-16.)  Plaintiff then requested a review by the Appeals Council ("AC").  (Tr. 143-47.)  By notice dated April 8, 2011, the AC denied plaintiff's request for review, thereby finding that the ALJ's decision became "the final decision of the Commissioner."  (Tr. 1; *see* 20 C.F.R. § 404.981 (1987) ("[T]he decision of the administrative law judge if the request for review is denied, is binding . . . .").)  Subsequently, plaintiff appealed the ALJ's decision to this Court.

II.   *Factual Background[1]*

    A.   *Non-Medical Background*

       1.   *Plaintiff's Testimony*

Plaintiff was born on November 7, 1969 (Tr. 92), was 36 years of age on the date of the alleged onset of disability, January 1, 2006, (Tr. 104), and 40 years of age on the date of the ALJ's decision, November 2, 2009. (Tr. 10-16). Plaintiff holds a high school diploma, and after graduating high school, plaintiff worked as a tractor trailer driver until he was laid off on January 1, 2006. (Tr. 29, 48-49.) Prior to that date, plaintiff's employer placed him on restricted duty because he had high blood pressure and respiratory problems. (Tr. 28.) While on restricted duty, he no longer drove a tractor trailer, but performed custodial tasks such as cleaning the warehouse. (Tr. 28-29; Pl.'s Mem. in Opp'n at 3.) Plaintiff testified that he was laid off because after he was unable to perform his duties as a tractor trailer driver, his employer did not have enough work for him. (Pl.'s Mem. in Opp'n at 3.)

During the hearing with the ALJ, plaintiff testified that he experienced trouble breathing, depression, pain in his right hip radiating to his right leg, back pain, chest pain, memory problems, and headaches. (Tr. 30, 33-34, 35, 44, 46-47.) Plaintiff testified, however, that he was not being treated for breathing problems or for depression. (Tr. 30, 44.) Plaintiff stated that he used Tylenol for pain management because his doctors advised him that anything stronger would not be good for his heart. (Tr. 47.) Plaintiff also testified that he had a stroke that caused his right leg to give out. (Tr. 34-35.) At the hearing, however, he was not using any cane or brace as a walking aid. (Tr. 49.)

---

[1] The facts provided here are recited in defendant's Memorandum in Support of its Motion for Judgment on the Pleadings at pages 2-13, and according to the plaintiff, "are accurate and not in dispute." (Pl.'s Mem. in Opp'n. at 3.)

Plaintiff also gave testimony regarding his physical abilities.  Plaintiff testified that he lived with his parents and that he could not perform household chores except for helping with the dishes for limited time periods.  (Tr. 28, 44.)  Plaintiff also stated that he could sit for about one half hour before needing to change position.  (Tr. 50-51.)  Plaintiff testified that he sometimes needed his father's help to clean his back and hold him up when showering, but that he could dress himself.[2]  (Tr. 49-50.)  Plaintiff also testified that he was able to lift two gallons of milk, (Tr. 51), and that he drove a car about once a week and occasionally took the bus to his doctor appointments.  (Tr. 42-43.)

Additionally, plaintiff testified that he spends his days mostly walking about his house, napping, reading, going on the internet, watching television, and taking walks to his former high school.  (Tr. 36, 41-42.)  Plaintiff explained that the distance to the high school is about five blocks, and that once there he usually walks around the school's quarter-mile track once or twice.  (Tr. 36-37.)  Plaintiff testified that it takes him about one to two hours to complete the entire walk because he has to rest for about ten to fifteen minutes and drink water at least a few times during each walk.  (Tr. 37-38, 41.)  He stated that he usually feels chest pain and shortness of breath during the walks and that he has to take naps when he gets home.  (Tr. 45-47.)  Plaintiff's mother testified that at least once a week plaintiff calls for his parents to come pick him up because he is too tired to complete the walk.  (Tr. 39-40.)

### 2.  *Function Report*

On November 5, 2008, plaintiff completed a Function Report for submission to the New York State Office of Temporary and Disability Assistance, Division of Disability Determination.  (Tr. 112-22.)  In the report, plaintiff described his daily activities as watching television and

---

[2] Plaintiff told Dr. Ciati that he could shower himself.  (Tr. 216.)

moving around the house.  (Tr. 113.)  Plaintiff stated that he was afraid of going to sleep and had

a loss of appetite.  (Tr. 113-14.)  Plaintiff also stated that he had no desire to maintain his

personal hygiene and needed his parents to remind him to change his clothes, wash himself,

brush his teeth, and take his medications.  (Tr. 114.)  Plaintiff indicated that he did not perform

household chores or prepare meals because he had shortness of breath and got tired easily.  (Tr.

114-15.)  Plaintiff stated that his hobbies and interests included reading and listening to music,

but that he could not engage in these activities for long periods of time due to his short attention

span.  (Tr. 116.)  Plaintiff also indicated that he is often tired, is forgetful, is in pain, and has a

hard time using his left side.  (Tr. 117.)  Plaintiff further stated that he could walk about half a

block before getting tired and having to rest for five to ten minutes.  (Tr. 118.)

    **B.  *Hospital Evidence***

        **1.  *Franklin Hospital***

On August 4, 2008, plaintiff visited the emergency room ("ER") at Franklin Hospital,

where he complained of fever, aches, chills, headache, and a sore throat.  (Tr. 149, 173, 179.)

His blood pressure upon arrival was 132/84, and he received intravenous fluid and intravenous

antibiotics.  (Tr. 150, 152.)  A chest x-ray taken that day revealed an enlarged heart, however, a

lung x-ray did not show any pneumonia or pleural effusion.  (Tr. 153.)  Plaintiff was discharged

that same day and was told to follow up with the clinic in a couple of days.  (Tr. 152.)

On or about August 8, 2008, plaintiff was admitted to Franklin Hospital because the

doctor wanted to test for sepsis.  (Tr. 156-57, 173, 283.)  On that day, an echocardiogram

revealed severe aortic insufficiencies.  (Tr. 165.)  Ultimately, plaintiff was diagnosed with

endocarditis.  (Tr. 179.)   Plaintiff then developed respiratory failure and required intubation and

a high dose of steroids.  (Tr. 179.)  In addition, the plaintiff developed progressive kidney

insufficiencies, (Tr. 173, 179), and a sensitive staph infection that required antibiotic treatment. (Tr. 167, 174, 179-80, 283.)

### 2. *North Shore University Hospital*

On August 15, 2008, plaintiff was transferred to North Shore University Hospital ("NSUH") to undergo a transesophageal echocardiography, the results of which showed "severe aortic valve regurgitation and severe mitral valve regurgitation." (Tr. 167, 173-74, 179-80, 283.) On that same day, plaintiff underwent emergency surgery for replacement of the aortic valve and mitral valve. (Tr. 167, 179-81, 280, 282-85.) Plaintiff required post-operative critical care management including full ventilatory support due to respiratory failure. (Tr. 170.)

On August 19, 2008, the doctor ordered an electrocardiogram, which returned normal results, (Tr. 202), however, since the plaintiff still required long-term ventilation, he underwent a tracheostomy on August 22, 2008. (Tr. 177, 280.) The plaintiff also developed "a bout of acute renal failure that resolved eventually." (Tr. 167, 170, 280.)

On September 1, 2008, plaintiff underwent an x-ray of his chest that suggested the plaintiff was suffering from pneumonia. (Tr. 201.) Further x-rays of plaintiff's chest taken on September 3 and 7, 2008, also revealed left pleural effusion. (Tr. 193, 199-200.) On September 8, 2008, plaintiff underwent another echocardiogram that revealed normal left and right ventricular systolic function, normal tricuspid and pulmonic valves without vegetations, mild-moderate tricuspid regurgitation, and minimal pulmonic regurgitation. (Tr. 194-95.) On that same day, the doctor ordered a CT-scan of plaintiff's brain, which showed no evidence of acute stroke. (Tr. 198.)

On September 12, 2008, plaintiff was discharged from NSUH with a blood pressure of 120/90. (Tr. 167, 171, 186, 190, 280.) Upon discharge, plaintiff's medications included Lasix,

K-Dur, Lopresso, Coumadin, Zoloft, Colace, Prilosec, Klonoin, folic acid, Neutrontin, Clonidine, and nafcillin.  (Tr. 168, 281.)  Plaintiff was supposed to go to a rehabilitation center where he would continue receiving intravenous antibiotics, but because he and his mother were not satisfied with the cleanliness of the facility, the plaintiff returned to NSUH.  (Tr. 186, 289, 293.)  Plaintiff was discharged again on September 17, 2008.  (Tr. 298.)  Upon final discharge the doctors advised plaintiff to follow a low-salt diet and perform daily activities as tolerated.  (Tr. 298.)

### C. *Cardiologists*

#### 1. *Dr. Saeed A. Siddiqui*

Plaintiff first saw Dr. Siddiqui, a Board certified cardiologist and internist with Cardiocare Consultants, on April 16, 2009.  (Tr. 257-59, 309-11.)  At his initial visit, plaintiff complained that for the past few months he had experienced shortness of breath lasting a few minutes, particularly when walking uphill and up staircases.  (Tr. 257.)  Plaintiff, however, denied any recent muscle aches, muscle weakness, muscular cramps, or joint pains.  (*Id.*)  Dr. Siddiqui also noted no recent history of chest pain, chest tightness or pressure, cold extremities, cough, distal cyanosis, distal swelling, dyspnea, edema, hemoptysis, murmurs, palpitations, phlebitis, tachycardia, thrombosis, varicosities, or wheezing.  (*Id.*)  Dr. Siddiqui reported that plaintiff was "well built and nourished."  (Tr. 258.)  Dr. Siddiqui further reported that plaintiff's blood pressure was 150/104, his lungs were clear, and his heart had a regular rhythm, with normal S1 and S2 sounds, and a sharp click.  (*Id.*)  Examination of the plaintiff's extremities showed no edema, no cyanosis, and no clubbing.  (*Id.*)  Dr. Siddiqui assumed plaintiff's symptoms were secondary to his increased blood pressure and advised him to keep taking his current medication, to start taking Coumadin, and to exercise and lose weight.  (Tr. 258.)

Plaintiff returned to Dr. Siddiqui for a second visit on April 30, 2009. (Tr. 262-63, 314-15.) At this visit, plaintiff complained that for the last few days he had experienced sporadic dizziness when getting up from laying or sitting. (Tr. 262.) Plaintiff further complained of shortness of breath lasting for a few minutes when walking up staircases. (*Id.*) Plaintiff's blood pressure was 120/96 and his heart examination revealed regular rhythm, no murmurs or gallops, normal S1 and S2 sounds, and no ectopy, rubs, or clicks. (*Id.*) Dr. Sidiqqui examined plaintiff's lungs and found that they were clear. (*Id.*) Dr. Siddiqui also performed an EKG, ordered a nuclear stress test, and advised plaintiff to continue on his current medications, to exercise, and to lose weight. (Tr. 262-63.)

On May 11, 2009, plaintiff returned to Dr. Siddiqui to undergo a nuclear stress test. (Tr. 264-65, 316-17.) Upon examination, plaintiff's heart rhythm was normal and his lungs were clear. (Tr. 264.) A musculoskeletal examination showed no edema, no cyanosis, and no clubbing. (*Id.*) The nuclear stress test suggested that plaintiff's heart rate and blood pressure were responding normally to exercise and that plaintiff was not experiencing ischemia or arrhythmias. (Tr. 265.) The test results, however, suggested that plaintiff had experienced an infarction during valve replacement surgery. (Tr. 265, 267.)

On May 14, 2009, plaintiff again visited Dr. Siddiqui. (Tr. 267-68, 319-20.) At this visit, plaintiff did not complain of any chest pain, dizziness, shortness of breath, or palpitations, and his blood pressure was 114/88. (Tr. 267.) Dr. Siddiqui found that plaintiff's heart rhythm was regular. (*Id.*) Similarly, the plaintiff's lungs were clear and a musculoskeletal examination showed no edema, no cyanosis, and no clubbing. (*Id.*) Dr. Siddiqui changed one of plaintiff's medications, but advised him to continue his other medications, to exercise, and to lose weight. (*Id.*)

8

On May 28, 2009, Plaintiff returned to Dr. Siddiqui, (Tr. 269-70), because he was noticing a fluttering in his chest, but a 24-hour Holter monitoring test beginning on May 18, 2009 did not show any arrhythmia, except for "one episode of bradycardia at 9:00 a.m." (Def.'s Mem. in Supp. at 10; Tr. 269.)  In addition, Dr. Siddiqui found that plaintiff's heart had a regular rhythm with no murmur or gallop, normal S1 and S2 sounds, and no ectopy, rubs, or clicks. (Tr. 269.)  The examination also showed that plaintiff's lungs were clear. (*Id.*)  Plaintiff was once again advised to continue on his current medications, to exercise, and to lose weight. (*Id.*)

Plaintiff returned to Dr. Siddiqui for a follow-up on July 1, 2009. (Tr. 323-24.)  At that time, plaintiff complained that he still noticed shortness of breath and experienced skipped heartbeats, although rarely. (Tr. at 323.)  A heart examination showed that the plaintiff's heart rhythm was regular, and a lung examination showed his lungs were clear. (*Id.*)  Dr. Siddiqui's musculoskeletal examination showed no edema, no cyanosis, and no clubbing. (*Id.*)  Dr. Siddiqui added norvase to plaintiff's list of medications, but otherwise advised him to keep taking his other medications, to keep exercising, and to lose weight. (Tr. 324.)

Plaintiff returned to Dr. Siddiqui on August 27, 2009. (Tr. 325-26.)  At this visit, plaintiff complained of becoming easily fatigued, but denied any chest pain, shortness of breath, or dizziness. (Tr. 325.)  At this visit, plaintiff's blood pressure read 130/90. (*Id.*)  Examinations showed that the plaintiff's heart was beating regularly and his lungs were clear. (*Id.*)  The musculoskeletal examination of plaintiff showed no edema, no cyanosis, and no clubbing. (*Id.*)  Dr. Siddiqui suggested plaintiff's weakness was from cardiomyopathy and advised plaintiff to continue with his current medications, to keep exercising, and to lose weight. (Tr. 325-26.)

On March 29, 2010, after the ALJ hearing, plaintiff returned to Dr. Siddiqui and complained of swelling in his legs. (Tr. 329-30.)  Plaintiff's blood pressure was 140/80, and a

heart examination showed regular rhythm with a metallic click.  (*Id.*)  Plaintiff's lungs were also

clear.  (*Id.*)  Dr. Siddiqui recommended that plaintiff continue on his current medications, keep

exercising, and loose weight.  (Tr. 330.)  Dr. Siddiqui also stated that a physical therapist would

be better equipped than he to determine plaintiff's capacity to lift and pull heavy objects.  (*Id.*)

## 2.  *Dr. Pilar Stevens Cohen—Cardiologist*

On August 14, 2009, Dr. Pilar Stevens Cohen, a cardiologist at Cardiocare Consultants

(the same clinic as Dr. Siddiqui[3]), completed an assessment of plaintiff's ability to do work-

related activities.  (Tr. 297-302.)  Dr. Cohen found that plaintiff could continuously lift up to

twenty pounds, frequently lift up to fifty pounds, and occasionally lift up to 100 pounds.  (Tr.

297.)  Dr. Cohen also found that plaintiff could frequently carry up to twenty pounds and

occasionally carry up to fifty pounds.  (*Id.*)  In addition, Dr. Cohen stated that plaintiff could

continuously sit for eight hours and stand or walk for three hours and that in an eight-hour

workday he could sit for eight hours and stand or walk for seven hours.  (Tr. 298.)  Further, Dr.

Cohen found that plaintiff did not require a cane to walk around.  (*Id.*)  Dr. Cohen also stated that

plaintiff could continuously reach, handle, finger, feel, push, and pull with both hands because he

had no history of limitations in his extremities.  (Tr. 299.)  Moreover, Dr. Cohen found that

plaintiff was able to continuously climb stairs, ramps, ladders, or scaffolds, and balance, stoop,

kneel, crouch, and crawl.  (Tr. 300.)  Dr. Cohen, however, found that plaintiff could be exposed

only occasionally to unprotected heights, extreme cold, and extreme heat.  (Tr. 301.)

On November 19, 2009, plaintiff returned to Dr. Cohen for a follow-up visit.  (Tr. 327-

328.)  At this time, plaintiff's disability application already had been denied, based in part on Dr.

Cohen's assessment.  (Tr. 327.)  Plaintiff told Dr. Cohen that he disagreed with Dr. Cohen's

---

[3] Plaintiff argues that Dr. Cohen is not his treating physician.  *See* Part IV.C *infra*.

assessment and that he wanted to be reevaluated.  (*Id.*)  Dr. Cohen stated that her earlier

assessment was "based on [plaintiff's] current cardiac state, which was based on his most recent

stress test data, age, and upon the information available to [Dr. Cohen] based on review of

medical records, and in fact, did not take into account physical limitations [plaintiff] may have."

(*Id.*)  Dr. Cohen's report also stated that she believed plaintiff's "symptoms were out of

proportion to his exams and test results."  (*Id.*)  On that date, Dr. Cohen examined the plaintiff

and found that his blood pressure was 150/110, his heart was beating regularly with a metallic

click, and his lungs were clear.  (*Id.*)  Dr. Cohen found that the plaintiff's cardiac state would

remain stable as long as he stayed on his current medications.  (Tr. 328.)  Dr. Cohen suggested

that plaintiff would benefit from physical therapy and that a physical therapist would be better

equipped to make a final determination on his body functionality.  (*Id.*)

### D.  *Other Medical Evidence*

#### 1.  *Dr. Jerome Caiati*

At the request of the State Disability Determination Services ("DDS"), Dr. Caiati

examined plaintiff on December 17, 2008.  (Tr. 215-118.)  Dr. Caiati reviewed plaintiff's

medical history, (Tr. 215), and found that plaintiff did not appear to be in any acute distress and

that he walked slowly with a normal gait, with or without the cane plaintiff stated was prescribed

to him for balance.  (Tr. 216.)  In addition, plaintiff needed no help getting on and off of the

examination table and was able to get up from a chair without any difficulty.  (*Id.*)  Dr. Caiati

also found that plaintiff's chest was clear, his heart was beating with a regular rhythm, and his

extremities gave no indication of cyanosis, clubbing, or edema.  (Tr. 217.)  Dr. Caiati also found

that plaintiff had full flexion and rotation of his cervical spine, full movement of his shoulders,

elbows, forearms, hip, knees, and ankles, and full strength in his upper and lower extremities.
(*Id.*)  A neurological examination did not reveal any neurological deficit.  (*Id.*)

Dr. Caiati's diagnoses of plaintiff included uncontrolled hypertension and depression
with history of drug abuse.  (Tr. 217-18.)  Dr. Caiati provided that plaintiff did not require any
restrictions with respect to sitting, standing, walking, reaching, pushing, pulling, lifting,
climbing, and bending.  (Tr. 218.)  Dr. Caiati also found that plaintiff's condition would remain
fair with diet and medication adjustment and that plaintiff would benefit from psychiatric or
psychological evaluation.  (*Id.*)

### 2. *Kathleen Acer, Ph.D.*

Upon request of the State DDS, Kathleen Acer, Ph.D., a New York State licensed
psychologist, conducted a psychiatric evaluation of plaintiff on January 7, 2009.  (Tr. 219-22.)
During the evaluation, plaintiff reported an "onset of emotional distress" prior to his heart
surgery and stated that he had not been in treatment.  (Tr. 219.)  Plaintiff further complained of
sleep difficulty, loss of appetite, depressed mood, irritability, stress, anxiety, nervousness, and
frustration over his physical problems and inability to work.  (*Id.*)  Plaintiff also reported that he
was worried about his financial situation, was socially withdrawn, felt overwhelmed, had no
patience, and felt tired.  (*Id.*)  Dr. Acer reported that plaintiff appeared well dressed, and well
groomed, but that he was irritable and hostile at times during the evaluation. (Tr. 220.)  Dr. Acer
noted that plaintiff walked with a limp and used a cane.  (*Id.*)  Dr. Acer's evaluation showed that
plaintiff' symptoms "appear[ed] to be consistent with some stress related problems, but in and of
[themselves did] not appear to be significant enough to interfere with functioning."  (Tr. 220-21.)

### 3. *Dr. R. Lopez*

On January 15, 2009, Dr. R. Lopez, a State Agency psychological consultant completed a Mental Residual Functional Capacity Assessment form for the plaintiff after reviewing plaintiff's medical records.  (Tr. 237-39; Def.'s Mem. in Supp. at 8.)  Dr. Lopez found that plaintiff was "capable of following supervision, relating appropriately to coworkers and performing [substantial gainful activity]," but found that he should not perform tasks that could lead to a high degree of stress.  (Tr. 239.)

### 4. *Dr. S. Gowd*

On January 29, 2009, at the request of the New York State Division of Disability Determination, Dr. S. Gowd, having reviewed plaintiff's medical records, provided medical advice regarding plaintiff's condition.  (Tr. 241-42.)  Dr. Gowd found that plaintiff was limited to standing six hours per day, lifting twenty pounds occasionally, and stooping and crouching occasionally.  (*Id.*)

### 5. *Dr. Osvaldo Fulco*

On October 6, 2009, Dr. Osvaldo Fulco, an expert witness for the defendant, responded to interrogatories from the plaintiff.  (Def.'s Mem. in Supp. at 12; Tr. 304-08.)  Having reviewed plaintiff's medical records, Dr. Fulco observed that none of plaintiff's impairments met or equaled any of the impairments in the Listing of Impairments, (20 C.F.R. Pt. 404, Subpt. P, App. 1), and that there was "no clinical evidence of congestive heart failure."  (Tr. 307.)  Dr. Fulco found that in an eight-hour work day, plaintiff could stand and/or walk for two hours and sit for six hours.  (Tr. 308.)  Dr. Fulco also found that plaintiff could frequently lift and carry up to ten pounds and occasionally lift and carry up to twenty pounds. (Tr. 308.)  Dr. Fulco further stated

that plaintiff's ability to stand, walk, and climb, was limited "because of dyspnea on exertion and left ventricular dysfunction."  (Def.'s Mem. in Supp. at 12; Tr. 306.)

### 6.  *Jules Heyman, Ph.D.*

Plaintiff submitted to the AC two letters from Jules Heyman, Ph.D., a New York State licensed psychotherapist.  (Tr. 141-42.)  The letters, dated July 12, and July 22, 2010, were written after the ALJ's decision.  (*Id*.)  In these letters, Dr. Heyman stated that the plaintiff's fatigue, dizziness, light-headedness, and agitation were side effects of his medication.  (Tr. 141.)  Dr. Heyman further stated that plaintiff suffered from depression, feelings of helplessness, and anxiety because "[h]is hopes, his dreams, [and] his ambitions were all shattered" when he no longer could work as a tractor trailer driver.  (*Id*.)  Dr. Heyman stated that he would work with plaintiff "to reduce his depression, anxiety, and feelings of helplessness and hopelessness."  (Tr. 141.)

### *DISCUSSION*

### I.  *Standard of Review*

### A.  *Review of the ALJ's Decision*

In reviewing a decision of the commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The court may set aside a determination of the ALJ only if it is "based upon legal error or is not supported by substantial evidence."  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks omitted).  "Substantial evidence is 'more than a mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion.'"  *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003) (quoting

*Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct 1420, 28 L. Ed. 2d 842 (1971)).

Furthermore, the findings of the Commissioner as to any fact, if supported by substantial

evidence, are conclusive, 42 U.S.C. § 404(g), and thus, the reviewing court does not decide the

case de novo.  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).  Thus, the only issue before

the Court is whether the ALJ's findings that plaintiff was not eligible for disability benefits was

"based on legal error or is not supported by substantial evidence."  *Rosa*, 168 F.3d at 77.

### B.  *Eligibility for Benefit*

To be eligible for disability benefit under the SSA, a claimant must establish that he is

unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  The SSA further states that this impairment must be "of such severity that [the

claimant] is not only unable to do his previous work but cannot, considering his age, education,

and work experience, engage in any other kind of substantial gainful work which exists in the

national economy . . . ."  *Id.* § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for evaluating

disability claims.  *See* 20 C.F.R. § 404.1520 (2012).  This Circuit has described the procedure as

follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in
> substantial gainful activity.  If he is not, the [Commissioner] next considers
> whether the claimant has a "severe impairment" which significantly limits his
> physical or mental ability to do basic work activities.  If the claimant suffers such
> an impairment, the third inquiry is whether, based solely on medical evidence, the
> claimant has an impairment which is listed in Appendix 1 of the regulations.  If
> the claimant has such an impairment, the [Commissioner] will consider him
> disabled without considering vocational factors such as age, education, and work
> experience . . . .  Assuming the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's severe impairment, he has the

residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (alterations in original) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curium)).  The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working.  *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

## II.    *The ALJ's Decision*

Applying the five-step analysis detailed in 20 C.F.R. § 404.1520, the ALJ found that plaintiff satisfied the first two steps of the analysis: (1) plaintiff had not engaged in substantial gainful activity since January 1, 2006; and (2) plaintiff's "left ventricular dysfunction, shortness of breath and hypertension" constituted severe impairments.  (Tr. 12.)  In contrast, the ALJ determined that plaintiff's "mental impairment of depression" caused only minimal limitations on his ability to work and was therefore a "non-severe limitation."  (*Id.*)  The ALJ then moved on to step three and found that plaintiff did not have an impairment or a combination of impairments that met or equaled one of the impairments listed in Part 404, Subpart P, Appendix 1 of the regulations.  (Tr. 13.)

Before proceeding to steps four and five, the ALJ found that plaintiff had "the residual functional capacity[4] to perform the full range of sedentary work."  (*Id.*)  Sedentary work is defined as work that involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools" and is "performed primarily in a seated position," although walking and standing is required occasionally, i.e., no more than one-

_____

[4] Residual functional capacity is defined as the "ability to do physical and mental work activities on a sustained basis despite limitations" from impairments.  (Tr. 11; *see* 20 C.F.R. § 416.945(a) (2012) ("Your residual functional capacity is the most you can still do despite your limitations").)

third of the time.  SSR 83-10, 1983 WL 31251 (Jan. 1, 1983).  In making this finding, the ALJ considered "all [of plaintiff's] symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with objective medical evidence." (Tr. 13.)  The ALJ also relied heavily on the opinions of Dr. Fulco and Dr. Cohen, both finding that plaintiff could perform sedentary work.  (Tr. 14-15.)

The ALJ then proceeded to steps four and five of the analysis.  At step four, the ALJ determined that plaintiff was unable to perform his past work as a tractor trailer driver.  (Tr. 14.)  The ALJ then turned to the fifth and final step in the analysis—whether plaintiff, given his residual capacity to perform sedentary work, was capable of performing any job in the national economy.  *Rosa*, 168 F.3d at 77.  Here, the ALJ considered a number of factors including plaintiff's age and education.  (Tr. 14-15.)  The ALJ noted that plaintiff, who was 36 years old at the time of the alleged onset of disability, was considered a "younger individual" pursuant to 20 C.F.R. §§ 404.1563 and 416.963.  (Tr. 14.)  The ALJ also noted that the plaintiff held a high school diploma and was able to communicate in English.  (*Id.*)  Furthermore, the ALJ concluded that "[b]ased on a residual functional capacity for the full range of sedentary work, considering the claimant's age, education, and work experience," the plaintiff was not disabled.  (Tr. 15.)

## III.   *The Parties Arguments*

The defendant argues that the decision of the ALJ should be affirmed because it "is supported by substantial evidence in the record and is based upon application of the correct legal standards." (Def.'s Mem. in Supp. at 1.)  The plaintiff, on the other hand, objects to the ALJ's decision and argues that it "was not supported by substantial evidence and should be reversed or annulled, or in the alternative,  . . . remanded for a new administrative hearing . . . ." (Pl.'s Mem. in Opp'n at 1.)  The plaintiff sets forth three reasons for its position.  First, the plaintiff asserts

that "the Commissioner has arbitrarily disregarded the subjective evidence of limitations and disability as testified to by the plaintiff and his mother, and documented by his physicians." (*Id.* at 9.) Second, the plaintiff asserts that the AC should have considered "additional medical evidence that [was] secured subsequent to the Administrative Hearing and provided to the [ALJ]" from Dr. Jules Heyman. (*Id.* at 8.) Third, the plaintiff asserts that the ALJ relied too heavily on the residual functional capacity evaluation of Dr. Cohen and failed to "give proper weight to the opinion of the plaintiff's treating sources," in particular, Dr. Siddiqui. (*Id.* at 8-9.)

**IV.** *Application of the Governing Law*

**A.** *Assessment of Credibility and Plaintiff's Subjective Testimony*

Social Security regulations require an ALJ to consider a claimant's subjective testimony regarding his symptoms when analyzing whether he is disabled. *See* 20 C.F.R. § 404.1529(a) (2011). The regulations contemplate a two-step process to evaluate a claimant's subjective testimony regarding his symptoms. First, the ALJ must determine "whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce" the claimed symptoms. *See* SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). Here, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 14.)

Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7p, 1996 WL 374186 at *2 (July 2, 1996). Moreover, if a claimant's subjective evidence of pain is supported by objective medical evidence, it is entitled to "great weight." *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (internal quotation marks omitted). If, however, a claimant's subjective explanation of his

symptoms suggests a greater severity of impairments than can be demonstrated by the objective

medical evidence, the ALJ must consider additional factors to determine the credibility of the

plaintiff, including the plaintiff's daily activities, the location, duration, frequency, and intensity

of symptoms, the type, dosage, effectiveness and side effects of medications taken to relieve

symptoms, and other treatments or measures taken to relieve those symptoms.  *See* 20 C.F.R. §

404.1529(c)(3).  Ultimately, if after consideration of the entire case record the findings of the

ALJ as to the credibility of the plaintiff are supported by substantial evidence, then "the court

must uphold the ALJ's decision to discount a [plaintiff's] subjective [statements]."  *Aponte v.

Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citing; *McLaughlin v.

Sec'y, of Health, Educ. and Welfare*, 612 F.2d 701, 704 (2d Cir. 1982)); SSR 96-7p, 1996 WL

374186.

Here, there was substantial evidence in the record for the ALJ to conclude that "the

claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms

are not credible to the extent they are inconsistent with the . . . residual functional capacity

assessment." (Tr. 14.)  In particular, the ALJ noted that although plaintiff testified that he was

not able to sit for longer than thirty minutes before having to change position, not able to lift

more than two gallons of milk, and only able to walk short distances, the objective medical

evidence presented by Dr. Fulco and Dr. Cohen suggested otherwise.  (*Id.*)  Dr. Fulco found that

plaintiff could stand and/or walk for two hours and sit for six hours in an eight-hour workday,

frequently lift and carry up to ten pounds, and occasionally lift and carry up to twenty pounds.

(Tr. 308.)  Similarly, Dr. Cohen found that plaintiff could sit for eight hours and stand or walk

for seven hours in an eight-hour work day.  (Tr. 297-98.)

The findings of Dr. Cohen and Dr. Fulco are supported by the other medical evidence in the record.  For example, Dr. Siddiqui repeatedly found that plaintiff's heart had a normal rhythm, plaintiff's lungs were clear, plaintiff was well built and nourished, and that plaintiff had no musculoskeletal complications.  (*See, e.g.*, Tr. 258, 262, 267, 323.)  Similarly, Dr. Caiati imposed no restrictions on plaintiff's ability to sit, stand, walk, and lift.  (Tr. 217-218.)  While Dr. Acer found that plaintiff had stress related problems, she stated these problems did not interfere with plaintiff's functioning, (Tr. 221), and Dr. Lopez stated that plaintiff could engage in substantial gainful activity as long as it did not lead to a high degree of stress.  (Tr. 239.)  Furthermore, Dr. Gowad opined that plaintiff could stand for six hours and lift twenty pounds occasionally.  (Tr. 241.)

In addition, evidence concerning plaintiff's daily activities supports the ALJ's findings that the plaintiff could perform sedentary work.  For example, the plaintiff testified that he spends his days, reading, watching television, going on the internet, and "walk[ing] up and down through the house."  (Tr. 35-36, 41.)  He is able, albeit with occasional rest stops along the way, to walk five blocks to his former high school and walk around the track, which is approximately a quarter-mile long.  At the hearing, plaintiff testified that he did not require any sort of cane or brace.  (Tr. 49.)  Plaintiff also reported to Dr. Caiati that he could shower and dress himself, (Tr. 216), and testified at the hearing that he drove a car about once a week and was able to take the bus if his parents were unavailable to drive him.  (Tr. 42-43.)

Therefore, the Court concludes that the ALJ's findings as to plaintiff's credibility are supported by substantial evidence and are, therefore, upheld.

## B.  *Consideration of Evidence Post-Dating the Hearing from Dr. Jules Heyman*

The plaintiff asserts that two letters from Dr. Heyman, dated July 12 and 22, 2010 were not properly considered as part of the medical evidence when the AC made its decision not to review his case. (Pl.'s Mem. in Opp'n at 8.)  The AC will only consider new medical evidence if it relates to a period on or before the plaintiff's hearing with the ALJ.  20 C.F.R. §§ 404.970(b), 416.1470(b) (1987).  Here, as the defendant points out, the letters, written by Dr. Heyman and submitted to the AC concerning plaintiff's mental impairments and the side effects of plaintiff's medications, both post date the ALJ's November 2, 2009 decision by almost nine months.  (Tr. 141-42; Def's Mem. in Supp. at 20.)  In addition, the letters indicate that Dr. Heyman will work with plaintiff "to reduce his depression, anxiety, feelings of helplessness, and hopelessness," and the extent to which these letters relate to the period on or before the ALJ's decision, or if at all, is unclear.  (Tr. 141.)

Even if the AC could have considered Dr. Heyman's letters, his opinion is not controlling because there is no evidence to establish that Dr. Heyman is or was the plaintiff's treating physician.[5]  The Social Security regulations define a treating physician as a claimant's "own physician . . . who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502 (2011).  Although Dr. Heyman states in his letters that he has known the plaintiff "for most of his life" (Tr. 141), there is no evidence to suggest that Dr. Heyman had an ongoing treatment relationship with the plaintiff.  Finally, to the extent the Court could construe Dr. Heyman's letters as providing any medical opinion, Dr. Heyman states only that plaintiff "despite his efforts to pursue his former career . . . is totally unable to do so" and makes no recommendation as to plaintiff's ability to perform other work existing in the national economy.

---

[5] *See* Part IV.C *infra*, discussing "treating physician rule."  (The opinion of an applicant's treating physician receives "controlling weight" if supported by substantial evidence in the case record.  20 C.F.R. § 404.1527(c)(2) (2011)).

(*Id.*)  As discussed above, a plaintiff is entitled to benefits only if he cannot perform any work existing in the national economy, which substantial evidence in the record states that he can perform.

Therefore, the Court finds that plaintiff's submission of Dr. Heyman's letters after the ALJ's decision did not require the AC to review plaintiff's case.

### C.  *The Treating Physician Rule*

Plaintiff argues that the AC should have overturned the ALJ's decision based on "records secured subsequent to the Administrative Hearing and presented to the Appeals Council prov[ing] that Dr. Cohen was not the plaintiff's treating cardiologist, but rather, Dr. Saeed A. Siddiqui was."[6]  (Pl.'s Mem. in Opp'n at 9.)  Social Security regulations require that the medical opinion of an applicant's treating physician receive "controlling weight" so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1527(c)(2) (2012); *see also Rosa*, 168 F.3d at 78-79.  The "treating physician rule" does not apply, however, when the treating physician's opinion is inconsistent with the other substantial evidence in the record, "such as the opinions of other medical experts."  *Halloran*, 362 F.3d at 32.  If the ALJ determines not to give the treating physician's opinion controlling weight, he or she "must consider various 'factors' to determine how much weight to give to the opinion."  *Id.* (citing 20 C.F.R. § 404.1527(c)).[7]  These factors include: (1) the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating physician's

---

[6] Here, the parties do not dispute whether the AC could consider new medical evidence from Dr. Siddiqui.  Therefore, the Court will assume that the AC could have considered evidence from Dr. Siddiqui insofar as it relates to the plaintiff's condition on or before the hearing.  *See* 20 C.F.R. §§ 404.970(b), 416.1470(b).

[7] Since the Second Circuit decided *Halloran*, the Social Securities Regulations have been amended.  At the time *Halloran* was written, the language cited here was found at 20 C.F.R. § 404.1527(d).

opinion; (3) consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors that are brought to the attention of the Social Security Administration that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c)(2) (i-ii) & (c)(3-6); *see also Halloran*, 362 F.3d at 32.  Furthermore, when giving the treating physician's opinion less than controlling weight, the ALJ must provide the claimant with "good reasons" for doing so.  20 C.F.R. § 404.1527(c)(2) (2011).  Even if the ALJ commits error in discounting the treating physician's opinion, however, "where application of the correct legal principles to the record could lead [only to the same] conclusion, there is no need to require agency reconsideration."  *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (quoting *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

Here, no remand is required because the plaintiff does not point to any portion of Dr. Siddiqui's opinion that contradicts Dr. Cohen.  In fact, Dr. Siddiqui's medical opinion supports both Dr. Cohen's and Dr. Fulco's assessments that plaintiff can perform sedentary work.  As discussed above, Dr. Siddiqui frequently found that plaintiff's heart and lungs were normal and that he was generally well nourished and had no musculoskeletal problems.  As a result, remand for further consideration of Dr. Siddiqui's records would lead only to the same conclusion that plaintiff is not disabled and is, therefore, not required.  *See Zabala*, 595 F.3d at 409.

Still, plaintiff seeks to cast doubt upon Dr. Cohen's opinion by relying on a report from November 19, 2009 (after the ALJ hearing) stating that in determining plaintiff's ability to perform sedentary work Dr. Cohen "did not take into account any physical limitations Mr. Walden may have."[8]  (Tr. 327.)  This statement alone, however, is not enough to discount the

---

[8] Again, the parties do not dispute that the AC could have considered new medical evidence from Dr. Cohen.  It seems the ALJ could have considered Dr. Cohen's statement since

substantial evidence in the record that plaintiff can perform sedentary work.  (Tr. 327.)  In the same report, Dr. Cohen reiterates that his previous assessment was based "on [plaintiff's] most recent stress test data, age, and upon the information available to [her] based on review of medical records."  (*Id.*)  Moreover, medical evidence from Dr. Fulco, Dr. Siddiqui, and Dr. Acer supports Dr. Cohen's assessment.  In fact, none of the physicians who evaluated the plaintiff's condition has opined that plaintiff is unable to perform sedentary work.  As a result, even if Dr. Cohen's statement could somehow be construed as support for plaintiff's argument that he cannot perform sedentary work, there is not substantial evidence in the record to support plaintiff's view.  Remand, therefore, would result in the same conclusion and is not required. *See Zabala*, 595 F.3d at 409.

### CONCLUSION

For the foregoing reasons, the defendant's motion is granted and the decision of the Commissioner is affirmed. The clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
         August 13, 2013

                                                    _____/s/_____
                                                    Denis R. Hurley
                                                    Unites States District Judge

---

it relates to her treatment of plaintiff before the ALJ hearing.  *See* 20 C.F.R. §§ 404.970(b), 416.1470(b).